**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DWAYNE R. TORRENCE, JR.,

Plaintiff,

v.

BARTELS, M.D., in his individual and official capacities; ROBERT P. WILLIAMS, M.D., in his individual and official capacities; BERNARD ALENDA, N.P., in his individual and official capacities; LIBERATUS DEROSA, M.D., in his individual and official capacities; MOFIKPARA WRIGHT, M.D., in his individual and official capacities; ELECTA AWANGA, N.P., in her individual and official capacities; EVELYN TATONG, in her individual and official capacities; NICOLE HARGRAVES, in her individual and official capacities; and DOES 1-50, inclusive,

Defendants

Civil Action No. SAG-20-1223

**AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF, AND DEMAND FOR JURY TRIAL**

1.      Plaintiff DWAYNE R. TORRENCE, JR. brings this First Amended Complaint for violation of civil rights pursuant to 42 U.S.C. § 1983 ("Amended Complaint") against named Defendants, and alleges as follows:

**JURISDICTION AND VENUE**

2.      This action arises under the United States Constitution and the Civil Rights Act pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution, to redress deprivations inflicted on Plaintiff by Defendants.  Jurisdiction of this Court is invoked under 28 U.S.C. §§1331, and 1343 and the aforementioned statutory and constitutional

1

provisions.  Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law.

3.      At all times mentioned herein, all Defendants were acting under the color of state law and violating rights secured to Plaintiff by the Eighth and Fourteenth Amendments to the United States Constitution and the laws of the United States.  This Court has supplemental jurisdiction over those claims asserted under state law by virtue of 28 U.S.C. § 1367.

4.       Venue is founded in this jurisdictional district upon 28 U.S.C. § 1391 as the acts complained of arose in this district.

## THE PARTIES

5.      Plaintiff DWAYNE R. TORRENCE, JR. is an inmate at Jessup Correctional Institution ("JCI").  He has been stricken with sickle cell disease his entire life.  Defendants knew this and yet deprived him of treatment for this serious medical condition from September 2019 until April 20, 2020.  Given Defendants wanton disregard for Plaintiff's health during this period, the potential for further deprivations is real and palpable.

6.      Defendant BARTELS, M.D. is a medical doctor at JCI who oversees Plaintiff's medical care at JCI.  He is an employee of the State of Maryland.  He is alleged to have been acting, at all times relevant to this case, in both his individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

7.      Defendant ROBERT P. WILLIAMS, M.D. is the chronic care doctor at JCI.  He is an employee of the State of Maryland.  He is alleged to have been acting, at all times relevant to this case, in both his individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

8.     Defendant BERNARD ALENDA, N.P. is a nurse practitioner at JCI who saw Plaintiff on numerous occasions.  He is an employee of the State of Maryland.  He is alleged to have been acting, at all times relevant to this case, in both his individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

9.     Defendant LIBERATUS DEROSA, M.D. is a medical doctor at JCI who oversees Plaintiff's medical care at JCI.  He is an employee of the State of Maryland.  He is alleged to have been acting, at all times relevant to this case, in both his individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

10.     Defendant MOFIKPARA WRIGHT, M.D. is a medical doctor at JCI who saw Plaintiff on numerous occasions.  He is an employee of the State of Maryland.  He is alleged to have been acting, at all times relevant to this case, in both his individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

11.     Defendant ELECTA AWANGA, N.P. is a nurse practitioner at JCI who treated Plaintiff on numerous occasions.  She is an employee of the State of Maryland.  She is alleged to have been acting, at all times relevant to this case, in both her individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

12.     Defendant EVELYN TATONG, R.N., is a registered nurse at JCI who treated Plaintiff on numerous occasions.  She is an employee of the State of Maryland.  She is alleged to have been acting, at all times relevant to this case, in both her individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

13.     Defendant NICOLE HARGRAVES is the Manager of JCI's Medical Department.  She is an employee of the State of Maryland.  She is alleged to have been acting, at all times

relevant to this case, in both her individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983.

14.     Plaintiff does not know the true names and capacities of Defendants DOES 1 TO 50, inclusive, and therefore sues them by their fictitious names.  Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants named as DOE are employees of the state of Maryland, acting in their individual and official capacities and under the color of state law within the meaning of 42 U.S.C. § 1983. Plaintiff is informed and believes, and on that basis alleges, that each of the Defendants named as DOE were, is, or will be in some manner responsible for the injury and damages suffered by Plaintiff as alleged in this Complaint.  When the true names and capacities of any of said Defendants are ascertained, Plaintiff will seek leave to amend this Complaint and insert their true names and capacities.

## I.     SICKLE CELL DISEASE

15.     Sickle cell disease ("SCD") is a group of inherited red blood cell disorders in which the red blood cells become hard and sticky, resembling a sickle or crescent.  The sickle cells die early, which causes a constant shortage of red blood cells.  When the red blood cells travel through smaller blood vessels, they become stuck and clog the blood flow.  This can cause chronic pain and other serious problems such as infection, acute chest syndrome, and stroke.

16.     SCD is one of the most common causes of priapism, a painful condition in which the penis remains erect for hours in the absence of stimulation.  Priapism typically requires prompt treatment in order to prevent tissue damage to a man's genitals.  Delayed treatment can result in impotence.

17.     A sickle cell crisis (also called a vaso-occlusive crisis) is a painful episode that can begin suddenly in a person who has SCD.  A sickle cell crisis occurs when the sickle-shaped red

blood cells clump together and block small blood vessels that carry blood to certain organs, muscles, and bones.  This can result in severe pain that can last from hours to days.

18.     Acute Chest Syndrome ("ACS") is one of the most serious complications of SCD. It is caused by inflammation in the pulmonary vasculature as a result of aggregates of sickled cells. ACS occurs with increased frequency in persons with a history of prior ACS events.  ACS can lead to multisystem organ failure, and is the most common cause of death for adults and children with SCD.

19.     Stem cell transplants and bone marrow transplants are the only known cures for SCD, but they are not performed often, because of the significant risks involved.

20.     A blood transfusion is a routine medical procedure in which donated blood is introduced into the patient's circulatory system.  Blood transfusions are a common treatment for patients with SCD, as the donor blood contains healthy, normally-shaped red blood cells that help to reduce anemia and to reduce the blood's viscosity, allowing the blood to flow more freely.  This, in turn, eases the painful conditions associated with SCD and prevents complications.

21.     An exchange transfusion is a less common type of blood transfusion in which nearly all of a patient's blood volume is slowly replaced with fresh donor blood.  According to the National Institute of Health's ("NIH") guidelines on evidence-based management of ACS in patients with SCD, exchange transfusions are strongly recommended.  Because of the complicated nature of the procedure, exchange transfusions are generally conducted at large medical centers, rather than regional hospitals.

22.     Hydroxyurea is a medication commonly prescribed to patients with SCD. Hydroxyurea can reduce the frequency of sickle cell crises and might reduce the need for blood transfusions and hospitalizations.

23.     L-glutamine is a medication prescribed to help reduce the frequency of sickle cell crises.  L-glutamine alone is not beneficial, but should be prescribed in conjunction with other treatments for SCD.

24.     Eliquis is an anticoagulant medication used to treat and prevent blood clots.  It has not been approved by the FDA to treat SCD.

25.     Venous access devices, such as a Medi-port, can be used in patients with SCD, as peripheral vein access is often a problem in patients who have had frequent transfusions, such as individuals with sickle cell disease (SCD).

26.     Pain management is often the central focus of treatment of SCD, given that it is rarely curable and can be severely painful.  Depending on the severity of their symptoms, patients may be directed to take over-the-counter pain relievers, such as acetaminophen (Tylenol), ibuprofen (Motrin), or opioids such as oxycodone and fentanyl.

27.     According to the NIH's guidelines on evidence-based management of sickle cell crisis, a sickle cell crisis is most commonly treated with opioids.  As patients with a sickle cell crisis present with severe pain and are at risk for other complications, best practice suggests that rapid triage, placement, and administration of pain medication should be encouraged.  The Emergency Severity Index ("ESI") Version 4 triage system, which is used by more than half of emergency departments in the United States, suggests that person with SCD be triaged as ESI level 2, a very high priority, and rapid placement be facilitated.  Patients in sickle cell crisis should be treated within 60 minutes of complaint.

## II.     PLAINTIFF'S MEDICAL HISTORY PRIOR TO JCI

28.     Plaintiff has had sickle cell disease (SCD) since he was *in utero*.  Plaintiff spent the first year of his life in intensive care at the hospital due to his disease.

29.     As a child, Plaintiff's disease was managed by Dr. Jeffrey Keefer, a pediatric hematologist/oncologist at The Johns Hopkins Hospital.

30.     Plaintiff was first prescribed oxycodone and fentanyl to treat the pain associated with his SCD when he was 11 years old.

31.     Plaintiff was prescribed hydroxyurea from ages 8 through 16 to treat the symptoms of his disease.  However, the hydroxyurea treatment proved to be ineffective.

32.     Plaintiff began treatment with Dr. Jennie Law, a hematologist/oncologist at the University of Maryland Medical Center ("UMMC") in 2017.  Dr. Law resumed hydroxyurea treatment, but it was ultimately unsuccessful in reducing the frequency of ACS in Plaintiff.

33.     Plaintiff's SCD causes him an immense amount of pain and injury, including chronic pain in his chest and back, and acute pain during sickle cell crises and episodes of priapism. Plaintiff has repeatedly suffered from ACS as a result of SCD.

34.     Because Plaintiff is prone to ACS and the ineffectiveness of hydroxyurea to prevent this life-threatening condition, Dr. Law started Plaintiff on exchange transfusions, which helped reduce the frequency of ACS.  Dr. Law put him on a regimen of monthly exchange transfusions to maintain the proportion of Plaintiff's sickled cells at under thirty percent.

35.     Before being incarcerated, Plaintiff was regularly prescribed 180 30mg oxycodone pills per month, as well as fentanyl patches, to manage the pain associated with his SCD.

36.     Plaintiff has an implanted Medi-port device, and has had such device at all times during his incarceration at JCI.  Defendants are aware of Plaintiff's Medi-port.

37.     Plaintiff was arrested in August 2017.  During most of his pretrial detention and during his imprisonment prior to arriving at JCI, Plaintiff received exchange transfusions regularly to prevent ACS.  At North Branch Correctional Institution ("NBCI"), the prison in which he was

incarcerated immediately prior to his transfer to JCI, Plaintiff received exchange transfusions regularly.

### III.    DEFENDANTS' FAILURE TO PROVIDE ADEQUATE CARE TO PLAINTIFF

38.    Plaintiff was transferred to JCI on May 3, 2019.  At the time, he was receiving monthly exchange transfusions at UMMC based on his order while at NBCI.  Defendants were aware that Plaintiff was receiving monthly exchange transfusions.

39.    Plaintiff was transferred to JCI from NBCI specifically because JCI was closer to his exchange transfusions at UMMC, which would impose a lesser administrative burden on prison staff.  UMMC is only approximately a 15-mile drive from JCI but approximately a 143-mile drive from NBCI.

40.    After Plaintiff's transfer to JCI, Defendants finished his order for exchange transfusions from NBCI.  Plaintiff continued to receive his monthly exchange transfusions from May through August 26, 2019.

41.    Defendants knew that Plaintiff required monthly exchange transfusions.  Defendant Wright requested an urgent, off-site service at UMMC for Plaintiff's exchange transfusion on May 10, 2019.  Defendant Awanga saw Plaintiff on July 29, 2019 and on September 3, 2019, after Plaintiff's return from UMMC for an exchange transfusion.  Defendant Awanga also saw Plaintiff on September 20, 2019, after Plaintiff returned from getting his blood drawn at UMMC in preparation for a for exchange transfusion.

42.    Notwithstanding this knowledge, and notwithstanding Plaintiff's critical medical needs, Defendants did not put in a new order for exchange transfusions once NBCI's order was completed.  Defendant Awanga saw Plaintiff after he was discharged from UMMC, yet ignored UMMC's recommendation that she order appropriate pain medication for him.

43.     Every month during May 2019 through September 2019, generally a few days prior to receiving his exchange transfusion, Plaintiff was sent to UMMC for blood work and labs.  Labs were required so UMMC could order the correct amount and type of blood needed.

44.     On September 20, 2019, Plaintiff went to UMMC for blood work and labs in anticipation of his next exchange transfusion.  He did not, however, receive his scheduled exchange transfusion on September 23, 2019.  Rather, Defendants told Plaintiff his next transfusion would be in October 2019, but Plaintiff did not actually receive another regularly scheduled transfusion until April 20, 2020.

45.     Defendants determined that Plaintiff should be on a hydroxyurea regimen notwithstanding that hydroxyurea treatment had been shown, in a clinical medical setting, to be ineffective in treating Plaintiff's SCD and ACS.

46.     Defendants failed to provide Plaintiff with hydroxyurea medication until March 2020.  Defendant Wright requested hydroxyurea, and Dr. Onabajo approved the request, on March 11, 2020.

47.     From August 2019 until March 2020, Plaintiff did not receive either exchange transfusions or hydroxyurea treatment.

48.     Plaintiff has never refused hydroxyurea.

49.     Defendants confiscated the Eliquis that Plaintiff brought with him from NBCI.

50.     Defendants almost entirely stopped providing opioid treatment to Plaintiff, seriously lowering the dosage and frequency of this medication.

51.     In the interim, Plaintiff submitted sick call requests and/or was seen by JCI's Office of Inmate Health Services for severe pain, priapism, and other complications from sickle cell disease over 30 times from August 2019 through April 2020.  During a majority of these instances,

Plaintiff reported a pain level of 7/10 or higher.   Plaintiff was typically treated with Toradol injections (a non-steroidal anti-inflammatory drug, or "NSAID"), IV fluids, and intermittently with low dosages of oxycodone or tramadol ER.

52.     Plaintiff was rushed to the hospital at least 4 times between August 2019 and April 2020.

53.     He was admitted to UMMC on October 20, 2019 for sickle cell complications. During the hospital stay, he was prescribed oxycodone 30mg and ibuprofen 800 mg every four hours as needed for pain, with the order that this regimen continue as needed.   He was also given an emergency transfusion, because his hemoglobin level was dangerously low.   Plaintiff stayed at the hospital until October 26, 2019.

54.     Defendants did not continue the regimen of medication and exchange transfusions that UMMC ordered in Plaintiff's October 26, 2019 discharge papers.   In particular, the discharge papers by Sowmya Arja, M.D., and attending physician Shoshana Jo Weiner, M.D., recommended that Plaintiff stop Nubain injections, start 30 mg oxycodone every four hours, and have a follow-up appointment with hematology on November 22, 2019.   Defendants refused to follow the appropriate oxycodone amounts and transfusions ordered by the hospital.

55.     Plaintiff was also sent to the emergency room on December 13, 2019, after experiencing severe pain and issues with his Medi-port.   He stayed at the hospital through December 23, 2019, and received a blood transfusion prior to being discharged.   The hospital recommended he continue to follow up with UMMC.

56.     Plaintiff was sent to the hospital again during March 7, 2020 through March 9, 2020, and March 13, 2020 for sickle cell crisis and pain.

57.     After each hospital admission, the medical professionals at the hospital advised Defendants that Plaintiff be put back on a regular exchange transfusion regimen and prescribed an appropriate level of pain management medication for Plaintiff's condition.    Defendants nevertheless did not restore Plaintiff's exchange transfusion treatments.

58.     Defendants refused to provide the proper pain relief, hydroxyurea, or exchange transfusion treatments.  Defendants have even recommended Tylenol for Plaintiff's pain on some occasions, despite the fact that he is severely allergic to Tylenol and can have seizures from taking it.  All of this is noted in his medical file.  Instead of providing the necessary treatment and pain relief, Defendants simply informed Plaintiff that he should drink water.

59.     Plaintiff has also suffered from painful episodes of priapism on multiple occasions while at JCI.  Despite prompt treatment being required to prevent tissue damage, Defendants have dismissed Plaintiff's episodes.  On at least one occasion, Plaintiff had to attempt to treat himself by taking a long, cold shower in the hopes that this would alleviate his pain.

60.     Upon information and belief, no one at JCI is properly certified to administer medications or IV solution through the Medi-port in Plaintiff's chest.  Instead, Defendants administer them intravenously, despite difficulties with peripheral vein access common in patients with SCD, including Plaintiff.  The doctors at UMMC do not put needles into his arms to administer drugs because they are aware that intravenous administration will cause more damage.

61.     Some of Plaintiff's medical providers advocated for him to receive proper care.  For example, Nurse Practitioner Adegorusi, employed at JCI, requested that Plaintiff resume transfusions on October 20, 2019 and January 31, 2020.   In addition, Dr. Temesgen (a pharmaceutical director at JCI) and Nurse Practitioners Motundrayo and Clarice Aryiku have advocated to Defendants (and especially to Dr. Bartels) that Plaintiff receive proper care.

62.     Plaintiff has sent Defendant Bartels at least one letter, explaining that Defendants were causing Plaintiff to miss exchange transfusions and the severe consequences that Plaintiff was experiencing as a direct result.  Upon information and belief, Defendant Bartels has the final approval authority in deciding to send Plaintiff out to receive exchange transfusions and in deciding to prescribe appropriate levels of pain medication for Plaintiff.

63.     Dr. Law has spoken over the phone to JCI's medical staff at least three times and written letters on at least three occasions.  During these calls and in these letters, Dr. Law explained Plaintiff's medical history.   Dr. Law advised that exchange transfusions are not optional in Plaintiff's case because he is prone to ACS, which is a life-threatening condition.  Dr. Law also advised that Plaintiff has tried hydroxyurea in the past, and that it was not effective in preventing ACS in his case.  Dr. Law explained the severe complications that could arise if Plaintiff does not receive regular exchange transfusions, up to and including death.

64.     In one such instance, Dr. Law spoke to JCI's medical staff on December 3, 2019. In response to Dr. Law's concerns and advice, Defendant Bartels told Defendant DeRosa that the standard of care is hydroxyurea, that hydroxyurea should be the "initial treatment," and that only if hydroxyurea were ineffective would Defendant Bartels consider resuming Plaintiff's exchange transfusions.  This is, again, despite the fact that hydroxyurea had already been proven to be ineffective in treating Plaintiff's SCD and its complications in a clinical medical setting.

65.     Defendant DeRosa questioned Defendant Bartels' response to Dr. Law's concerns about Defendants' refusal to provide Plaintiff with exchange transfusions.  In an administrative note, Defendant DeRosa wrote that "Dr. Bartels advised that the [standard] of care is hydroxyurea, which I am not sure is superior to 8 unit exchange transfusion."

66.     Ellen Dupont, UMMC's Sickle Cell Nurse Navigator, has also spoken to JCI's medical staff about Plaintiff's condition, his medical history, and the need for regular exchange transfusions.

67.     Since Plaintiff's transfer to JCI, Defendants had access to Plaintiff's medical records at UMMC, which also reflected Plaintiff's history of ACS, the ineffectiveness of hydroxyurea in his case, and his need for regular exchange transfusions.

68.     Defendant DeRosa falsely noted in his December 3, 2019 note that that Plaintiff was on a hydroxyurea plan "since 8/17/19," even though Plaintiff had not been prescribed hydroxyurea until March 2020.

69.     Defendants knew that Plaintiff had tried hydroxyurea to treat sickle cell disease in the past, without success.

70.     Defendants did not resume exchange transfusions until April 20, 2020, a full month after Plaintiff had exhausted his administrative appeals related to the denial of transfusions.

71.     Defendants have not yet provided the appropriate levels of oxycodone or fentanyl for Plaintiff's pain relief.

72.     Plaintiff had visited Defendant Alenda's office on multiple occasions seeking pain medication, because Plaintiff was in severe pain or going through sickle cell crises as a direct result of missing his exchange transfusions.  Defendant Alenda refused to provide the appropriate levels of oxycodone or fentanyl and instead prescribed Tylenol to which Plaintiff is deathly allergic.

73.     Plaintiff has informed Defendants that Motrin gave him severe stomach problems, and yet Defendants, including Defendant Alenda, have given him Motrin for his pain.

74.     Defendant Williams failed to write orders for exchange transfusions or prescriptions, despite actual knowledge of Plaintiff's pain and sufferings and ACS.  On May 9,

2020, Dr. Williams noted that Plaintiff came to see him because he was in "severe pain." Defendant Williams recommended IV fluids to Plaintiff, despite Plaintiff protesting that he did not want nurses "digging in his arm." Defendant Williams argued with Plaintiff on multiple occasions while Plaintiff was in sickle cell crisis and refused to prescribe oxycodone or fentanyl.

75.    Defendant Awanga saw Plaintiff on multiple occasions for pain, including severe chest and back pain and priapism. Defendant Awanga knew that Plaintiff had received exchange transfusions based on orders prescribed while Plaintiff was at NBCI. Defendant Awanga ignored Plaintiff's requests to resume his transfusions. When Defendant saw Plaintiff for his priapism episodes, Defendant Awanga only gave Plaintiff ice packs for treatment and told him to drink water. During Plaintiff's ACS events, Defendant Awanga refused to send Plaintiff out to the hospital despite the emergency, life-threatening nature of ACS.

76.    On several occasions, when Plaintiff arrived at the infirmary seeking medical care, Defendant Awanga refused to see Plaintiff, and told other medical staff members not to see or treat Plaintiff.

77.    Defendant Tatong took part, along with Defendant Awanga, in refusing to see Plaintiff, and urging other medical staff not to treat Plaintiff. Defendant Tatong ignored Defendants' severe pain from missing his exchange transfusions and oxycodone and refused to send him to a nurse practitioner or a doctor on multiple occasions. Defendant Tatong laughed on at least one occasion at Plaintiff's priapism.

78.    On at least one occasion, Natalie Bih, R.N., who was staffing the infirmary at the time Plaintiff arrived, told Plaintiff to return only after Defendant Awanga was not on her shift at the infirmary.

79.     Defendant Wright refused to provide the appropriate levels of oxycodone, despite being aware that Plaintiff was in severe pain due to Defendants' failure to send him out for exchange transfusions.

80.     On June 2020, Dr. Temesgen, R.N. Aryiku, and Defendant Hargraves interviewed Plaintiff and concluded that Plaintiff should receive oxycodone permanently going forward. Plaintiff has received oxycodone for one month but has not received it since then.

## IV.     Procedural History

81.     Plaintiff has written multiple letters to Defendant Hargraves, pleading with her to send him out for exchange transfusions and to provide appropriate pain medication.  In particular, the letters detail the negative effects Plaintiff was experiencing as a direct result of missing the exchange transfusions.  Defendant Hargraves regularly interacts with Plaintiff and is aware that he is not receiving his exchange transfusions and appropriate pain medication and the negative effects of being denied those.

82.     Plaintiff also has written multiple letters to Allen Gang, warden of JCI ("Warden Gang"), pleading with him to send him out for exchange transfusions and to provide appropriate pain medication.  In particular, the letters detail the negative effects Plaintiff was experiencing as a direct result of missing the exchange transfusions.

83.     On August 24, 2019, Plaintiff filed a request for administrative remedy Administrative Remedy Procedure ("ARP") Case No. JCI 0831-19 with the Maryland Division of Correction.  ARP Case No. JCI 0831-19 requested oxycodone 30 mg, in the same dosage and frequency as he received at NBCI and that Dr. Law had recommended.  Instead of following precedent, JCI decided to inject intermuscular shots into Plaintiff that damaged his tissue and had no relieving effects and to ignore his cries for help.

84.    Warden Gang received ARP Case No. JCI 0831-19 on August 27, 2019 and dismissed it on October 8, 2019.  Warden Gang's Response noted that Ibuprofen, Nubain, and NSAID shots were working and refused to approve oxycodone.

85.    On November 3, 2019, Plaintiff appealed Warden Gang's Response in ARP Case No. JCI 0831-19 and explained again that Nubain shots made Plaintiff sick and that Ibuprofen was ineffective for sickle cell patients with extreme pain as Plaintiff experienced.  The Department of Correction, ARP/IGP Unit, dismissed the appeal request on November 26, 2019, for not receiving the appeal request within the established timeframe under C.O.M.A.R. 12.02.28.09.B.  There is no evidence that Plaintiff failed to submit the appeal request within the timeframe of C.O.M.A.R. 12.02.28.09.B.  Plaintiff appealed the disposition of ARP Case No. JCI 0831-19, as IGO Case No. 20200311, on March 3, 2020, to the Inmate Grievance Office ("IGO").  The IGO received the appeal on March 4, 2020 subsequently dismissed it.

86.    On November 22, 2019, Plaintiff filed a request for administrative remedy ARP Case No. JCI 1291-19 with the Maryland Division of Correction.  ARP Case No. JCI 1291-19 requested compensation for Defendants' failure to provide monthly exchange transfusions to Plaintiff and for JCI to start providing monthly transfusions.  In ARP Case No. JCI 1291-19, Plaintiff noted that Defendant Wright informed Plaintiff that Plaintiff's transfusion orders were valid until January 2020.  Despite this, JCI failed to take him to his exchange transfusions on multiple occasions, which directly resulted in his hospitalizations and extreme pain.  Plaintiff specifically informed Defendants Bartels and Hargraves that he was missing his exchange transfusions and the impact these were having on him.  As a result of Defendants' failures to provide proper medical care, Plaintiff's body shut down dramatically and that Defendants' inactions were "killing [him] literally."

87.     Warden Gang received ARP Case No. JCI 1291-19 on November 26, 2019.  Gang assigned ARP Case No. JCI 1291-19 to Defendant Hargraves on or around December 1, 2019.

88.     Defendant Hargraves interviewed Plaintiff in connection with ARP Case No. JCI 1291-19 on December 6, 2019.  Plaintiff sent a letter to Warden Gang on December 11, 2019, asking him to look into his ARP Case Nos. JCI 0831-19 and JCI 1291-19.  Warden Gang forwarded the letter to Defendant Hargraves, asking her to handle as she saw fit.  Defendant Hargraves responded on December 18, 2019 that Plaintiff was not compliant with "medication" and that he needed to be compliant before "he can go on to the next steps."

89.     Defendant Hargraves' ARP Case Summary dated December 23, 2019 falsely noted that Plaintiff was non-compliant with hydroxyurea and should consider restarting it.  Plaintiff had not been prescribed hydroxyurea until March 2020.

90.     On December 31, 2019, Warden Gang dismissed ARP Case No. JCI 1291-19, because, among other reasons, Plaintiff was allegedly non-compliant with Eliquis, hydroxyurea, and L-Glutamine.  Warden Gang noted that Plaintiff should restart hydroxyurea as the initial step, before trying monthly blood transfusions, despite Defendants not providing hydroxyurea as of the date of the dismissal and Defendants knowing that hydroxyurea has been proven ineffective in treating Plaintiff's SCD or preventing ACS in his case.

91.     On January 6, 2020, Plaintiff appealed ARP Case No. JCI 1291-19 and explained that for both of his sickle cell crises hospital admissions, Dr. Law was consulted and advised Defendants that Plaintiff must be given monthly transfusions.  Plaintiff also explained that Warden Gang's dismissal did not make sense because noncompliance with Eliquis and L-Glutamine were not related to treatment of SCD.  Plaintiff explained that he took hydroxyurea from age 8 through 16 but it had no effect, which was why he started receiving monthly blood transfusions.  Plaintiff

also explained that NBCI transferred him to JCI to make it easier for Plaintiff to receive blood transfusions.  Lastly, Plaintiff noted that his Medi-port needed monthly maintenance to prevent infections, yet Defendants denied Plaintiff such maintenance.

92.    On January 14, 2020, the Commissioner notified Plaintiff that he is extending his deadline to respond to ARP Case No. JCI 1291-19 by 15 calendar days and that the new due date for the response was February 28, 2020.  Sometime between January 6, 2020 and January 27, 2020, the Department of Public Safety and Correctional Services ("DPSCS") accepted ARP Case No. JCI 1291-19.

93.    On January 27, 2020, the Division of Correction, Office of the Commissioner of the DPSCS directed Adaora Odunze, DPSCS Director of Nursing, D. Cooper, and B. Jones, to complete an investigation of ARP Case No. JCI 1291-19.  The investigation must entail six steps, each of which shall be documented in writing: (1) Interviews of relevant witnesses named by the inmate, absent good cause; (2) Interview of relevant employees, absent good cause; (3) Review of all relevant documents; (4) Specific findings of fact; and (5) Specific recommendation based upon the application of governing rules and regulations to the facts.  The completed report was due February 17, 2020.

94.    Olayinka Ukim, RN, was assigned as the investigator of ARP Case No. JCI 1291-19.  Ukim relied on Defendant Hargraves' December 6, 2019 interview, instead of conducting her own interview of Plaintiff.  Upon information and belief, neither Defendant Hargraves nor Ukim documented the interview in writing.  Ukim did not interview witnesses or employees implicated by ARP Case No. JCI 1291-19, contrary to steps 2 and 3 of the ARP investigation requirements.  Ukim erroneously found that Plaintiff received an exchange transfusion on January 27, 2020.

Ukim erroneously did not document any findings of fact prior to December 3, 2019.   Ukim submitted his or her report on February 14, 2020.

95.      Plaintiff submitted a letter to the IGO on March 3, 2020, stating he has received monthly exchange transfusions since 2017 while at North Branch and that he was sent to JCI because it would be easier to receive blood transfusions at JCI.   Since being at JCI, Plaintiff has only received four transfusions and has been admitted to hospitals on numerous occasions due to one sickle cell crisis after another.   Plaintiff's discharge papers state that Plaintiff requires monthly transfusions and requested that the IGO call Dr. Law.

96.      The IGO received Plaintiff's grievance regarding the appeal of ARP Case No. JCI 1291-19 on March 4, 2020 (IGO No. 20200312).   On March 24, 2020, the Commissioner dismissed ARP Case No. JCI 1291-19, because Plaintiff was allegedly "receiving treatment comparable to community standards" and that Plaintiff was not compliant with his "medication." The Commissioner moreover alleged that Plaintiff had been "educated on this issue" and incorrectly alleged that Plaintiff had "received multiple blood transfusion."

97.      On March 23, 2020, Plaintiff filed a request for administrative remedy ARP Case No. JCI 0346-20 with the Maryland Division of Correction.   ARP Case No. JCI 0346-20 requested a remedy for Defendants' failure to provide Plaintiff's exchange transfusion that had been scheduled for March 20, 2020.

98.      On May 13, 2020, Plaintiff filed his first Complaint with this court regarding the disposition of ARP Case No. JCI 1291-19.

99.      On or about September 16, 2020, a decision was issued on Plaintiff's ARP Case No. JCI 0346-20, nearly six months after Plaintiff filed the request.   The decision found Plaintiff's request for administrative remedy to be "meritorious."   It found that Plaintiff had not been taken

out for his scheduled exchange on March 20, 2020, and that there was "no justification" for why Plaintiff was not taken to that appointment.  Still, the only remedy provided by the decision was that staff were instructed to note in their records when Plaintiff missed appointments.  In other words, according to the ARP decision, the lack of records that Plaintiff was not taken to his exchange transfusion on March 20, 2020 was the problem—not that Plaintiff was not taken to the appointment to receive necessary treatment.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS [42 U.S.C §1983]**
**EIGHTH AMENDMENT**
**(By Plaintiff Against All Defendants)**

100.    Plaintiff hereby incorporates and realleges paragraphs 1 through 99 of this Amended Complaint as though fully set forth herein.

101.    Defendants demonstrated a deliberate indifference to Plaintiff's serious medical needs when they refused to provide his exchange transfusion treatments, failed to provide proper pain management, and failed to properly care for Plaintiff's Medi-port.

102.    Defendants were employed by the State of Maryland, and acted under color of law to deprive Plaintiff of constitutionally protected rights.

103.    On multiple occasions, Plaintiff informed Defendants that he required regular transfusion treatments for his SCD, that he had received them regularly in the past, and that he had tried hydroxyurea in the past, but that hydroxyurea treatment had proven to be non-optimal, given the severity of his disease.

104.    Plaintiff was already regularly receiving exchange transfusion treatments while at NBCI prior to being transferred to JCI.  Defendants finished his last order for exchange transfusion treatments from NBCI, but refused to renew that order.

105.    Plaintiff's medical history of requiring regular exchange transfusions is in medical records available to Defendants.

106.    Plaintiff's own hematologist, Dr. Law (as well as her staff), communicated with Defendants (and their staff) on multiple occasions, and informed Defendants that they caused Plaintiff to miss appointments for exchange transfusion treatments with her.  Dr. Law insisted on these occasions that it was a medical necessity for Plaintiff to have exchange transfusions done on a monthly basis because he is prone to ACS, and insisted that Defendants resume Plaintiff's regular exchange transfusion treatments.  Dr. Law communicated the risks if Plaintiff did not receive these transfusions, up to and including death.  Defendants nevertheless insisted on a hydroxyurea regimen that they knew had already proven to be ineffective for Plaintiff and failed to prescribe hydroxyurea during May 2019 through March 2020.

107.    As a result of Defendants' deliberate indifference to Plaintiff's serious medical need for exchange transfusion treatment and appropriate pain management, Plaintiff has suffered increased chronic pain, several sickle cell crises, and life-threatening ACS.  Each crisis was accompanied by severe pain, chest tightness, and severe shortness of breath, among other afflictions.  Some of these conditions caused Plaintiff to be sent to the hospital for a period of days.

108.    Plaintiff has also suffered severe pain—and potential long-term tissue damage and impotence—caused by Defendants' refusal to treat Plaintiff's priapism episodes brought on by his disease.

109.    Defendants had direct or indirect knowledge of Plaintiff's pain and suffering due to missing his monthly transfusions, hydroxyurea, or the appropriate dosage and frequency of pain medication.

110.    Defendant Bartels, at all times relevant to this case, acted in his individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant Bartels knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition and could result in his death.  Defendant Bartels consciously disregarded this risk by repeatedly preventing Plaintiff from receiving exchange transfusion treatments and reasonable pain management—despite certain of his colleagues' recommendations to the contrary—in violation of Plaintiff's Eighth Amendment rights.

111.    Defendant Williams, at all times relevant to this case, acted in his individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant Williams knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition and could result in his death.  Defendant Williams consciously disregarded this risk by repeatedly refusing to provide exchange transfusion treatments and reasonable pain management in violation of Plaintiff's Eighth Amendment rights.

112.    Defendant Alenda, at all times relevant to this case, acted in his individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant Alenda knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition and could result in his death.  Defendant Bernard consciously disregarded this risk by repeatedly

22

refusing to provide exchange transfusion treatments and reasonable pain management in violation of Plaintiff's Eighth Amendment rights.

113.    Defendant DeRosa, at all times relevant to this case, acted in his individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant DeRosa knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition and could result in his death.  Defendant DeRosa consciously disregarded this risk by repeatedly refusing to provide exchange transfusion treatments in violation of Plaintiff's Eighth Amendment rights.

114.    Defendant Wright, at all times relevant to this case, acted in his individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant Wright knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition and could result in his death.  Defendant Wright consciously disregarded this risk by repeatedly refusing to provide exchange transfusion treatments in violation of Plaintiff's Eighth Amendment rights.

115.    Defendant Awanga, at all times relevant to this case, acted in his individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant Awanga knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition

and could result in his death.  Defendant Awanga consciously disregarded this risk by repeatedly refusing to provide exchange transfusion treatments and reasonable pain management in violation of Plaintiff's Eighth Amendment rights.

116.    Defendant Tatong, at all times relevant to this case, acted in his individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant Tatong knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition and could result in his death.  Defendant Tatong consciously disregarded this risk by repeatedly refusing to provide exchange transfusion treatments and reasonable pain management in violation of Plaintiff's Eighth Amendment rights.

117.    Defendant Hargraves, at all times relevant to this case, acted in her individual and official capacities and under the color of state law, with deliberate indifference to Plaintiff's serious medical needs by refusing to provide exchange transfusion treatments for Plaintiff's SCD. Defendant Hargraves knew that denying exchange transfusion treatments—as well as an appropriate level of pain management—carried an excessive risk of worsening Plaintiff's medical condition and could result in his death.  Defendant Hargraves consciously disregarded this risk by repeatedly refusing to provide exchange transfusion treatments and reasonable pain management in violation of Plaintiff's Eighth Amendment rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.      For an injunction and order that Defendants must transfer Plaintiff to a different facility that can adequately care for Plaintiff;

2.      For an injunction and order that Defendants must provide monthly exchange transfusion treatments at UMMC;

3.      For an injunction and order that Defendants must follow the medical opinion of Dr. Law;

4.      For an injunction and order that Defendants must provide adequate pain management treatment;

5.      For general damages, in an amount to be determined at trial;

6.      For punitive damages, in an amount to be determined at trial;

7.      For attorneys' fees and costs of suit herein pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

8.      For other and further relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  October 19, 2020

Respectfully submitted,

By: ___*/s/ George M. Clarke*_____

George M. Clarke
Bar No. 16688
815 Connecticut Avenue NW
Washington, DC 20006
Tel:  (202) 452-7057
Fax: (202) 416-7024
george.clarke@bakermckenzie.com

Yea-Jin Angela Chang
Bar No. 814335
*Pro Hac Vice*
660 Hansen Way
Palo Alto, CA 94304
Tel:  (650) 856-2400
Fax: (650) 856-9299
angela.chang@bakermckenzie.com

Nicholas O'Brien
Bar No. 814049
*Pro Hac Vice*
452 Fifth Avenue
New York, New York 10018
Tel:  (212) 626-4100
Fax: (212) 310-1600
nicholas.obrien@bakermckenzie.com

Christina Taylor
Bar No. 814220
*Pro Hac Vice*
660 Hansen Way
Palo Alto, CA 94304
Tel:  (650) 856-2400
Fax: (650) 856-9299

christina.taylor@bakermckenzie.com

BAKER & McKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel:  (202) 452-7057
Fax: (202) 416-7024

*Attorneys for Plaintiff, Dwayne R. Torrence, Jr.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of October, 2020, a copy of the foregoing

Amended Complaint for Declaratory, Injunctive, and Other Relief was mailed via first class

mail, postage prepaid, to

Dr. Bartels, MD.                                        Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Robert P. Williams, M.D.                                Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Bernard Alenda, N.P.                                    Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Liberatus Derosa, M.D.                                  Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Mofikpara Wright, M.D.                                  Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Electa Awanga, N.P.                                     Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Evelyn Tatong                                                                  Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Nicole Hargraves                                                               Defendant
Jessup Correctional Institution
Department of Public Safety and Correctional Services
Post Office Box 534
Jessup, Maryland 20794

Stephanie Lane-Weber                                                           Interested Party
Assistant Attorney General
Federal Bar No. 00023                                                          *Via CM/ECF Only*
St. Paul Plaza - 19th Floor
200 St. Paul Place
Baltimore, Maryland 21202


Dated:  October 19, 2020

                                              By:_____
                                              Christina Taylor
                                              Bar No. 814220
                                              *Pro Hac Vice*
                                              660 Hansen Way
                                              Palo Alto, CA 94304
                                              Tel:  (650) 856-2400
                                              Fax: (650) 856-9299
                                              christina.taylor@bakermckenzie.com