**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DWAYNE R. TORRENCE, JR., | |
| Plaintiff, | Civil Action No. 1:20-CV-01223-SAG |
| v. | |
| BARTELS, M.D., *et al.* | |
| Defendants | |

**PRETRIAL ORDER**

a. **A Brief Statement of Facts That Plaintiff Proposes to Prove in Support of Plaintiff's Claims, Together with a Listing of the Separate Legal Theories Relied Upon in Support of Each Claim.**

This civil rights case is before the Court because Defendants have violated the Eighth Amendment of the U.S. Constitution by deliberately failing to provide sickle cell disease treatment for more than six months to Plaintiff Dwayne R. Torrence, Jr. while he has been incarcerated in Maryland State Department of Corrections prisons under their care. That failure to provide necessary treatment has put his life at risk and caused Mr. Torrence excruciating pain and damage to his organs.

Defendants are medical professionals who work or worked for Corizon Health, Inc. (now operating under the name of "YesCare") from August 2019 through March 2020 and who have been responsible for providing care to Mr. Torrence or making decisions about his care while he has been incarcerated in Jessup Correctional Institution ("JCI"), which is operated by the Maryland DOC.

Through documentary evidence and witness testimony, Mr. Torrence will prove that he has suffered from sickle cell disease ("SCD") of the most severe variety, hemoglobin SS disease, for his entire life. Mr. Torrence, who is now 29 years old, spent the first year of his life admitted to an

intensive care unit as a result of this disease.   Mr. Torrence's SCD causes, among other complications, "sickle cell crises," which include vaso-occlusive crises, episodes of acute chest syndrome, and priapism.   Vaso-occlusive crises are acute, excruciatingly painful events where sickled cells block blood flow to deprive tissue of oxygen.   They can lead to stroke and are the leading cause of hospital and emergency department utilization related to SCD.   Acute chest syndrome is an excruciatingly painful life-threatening complication of SCD in which sickled cells injure the lungs by blocking small blood vessels; it is one of the leading causes of death of those with SCD.   Priapism is an unwanted, prolonged, and painful penile erection.   Prompt treatment for priapism is typically required to prevent tissue damage.   Those three complications, as well as others, usually require emergency room visits and hospital admissions.

Treatment for SCD typically involves mitigating the damaging effects of sickled cells on the body (i.e., disease-modifying therapy) and pain management.   One first-line treatment for SCD is orally-administered hydroxyurea combined with strong pain medication.   However, medical records from JCI and witness testimony will show that the drug was ineffective at treating Mr. Torrence's SCD.   Mr. Torrence then came into the care of Dr. Jennie Law, the Director of the Hematology-Medical Oncology Fellowship Program at UMMC.   She prescribed monthly red blood cell exchange transfusions and 30 mg of oxycodone every four hours, as needed.   She also ordered that Mr. Torrence have a port placed in his chest, which—given the risks with having such a device permanently implanted in his body—was "a clear indication that Dr. Law had intended for Mr. Torrence to be on chronic exchange transfusions for his disease modifying therapy for the long term."

Medical records and witness testimony will show that the monthly blood exchange transfusions were highly effective at treating Mr. Torrence's SCD and reducing the occurrence of

sickle cell crises, and the resulting emergency room visits and hospital admissions. Mr. Torrence regularly received exchange transfusions before he was incarcerated, during his pre-trial detention, and while at North Branch Correctional Institution ("NBCI") before being transferred to JCI.

Medical records and witness testimony will show that, after he was first transferred to JCI on May 3, 2017, Mr. Torrence was allowed to finish out Dr. Law's ordered course of monthly exchange transfusions, and he received his last regularly scheduled monthly exchange transfusion on August 26, 2019. Mr. Torrence did not receive another scheduled exchange transfusion until March 23, 2020. After the order expired, Defendants effectively "decided" to stop Mr. Torrence's exchange transfusions in September 2020 when the order was not renewed,[1] and failed to provide Mr. Torrence with his regularly scheduled monthly exchange transfusions for six months.

During that *six-month period*, Mr. Torrence's medical records show that he was taken to the emergency room and admitted to the hospital at least four times for sickle cell crises. Mr. Torrence was admitted to UMMC for seven days from October 20-26, 2019, where he received an emergency exchange transfusion on October 25, 2019. Mr. Torrence was admitted to Johns Hopkins Hospital for ten days from December 13-23, 2019. On February 24, 2020, Mr. Torrence was admitted to the University of Maryland Baltimore Washington Medical Center ("BWMC"). Mr. Torrence was admitted to BWMC again the following month for four days from March 6-9, 2020.

During those six months, Mr. Torrence's medical records are replete with instances where he told Defendants that he was in a sickle cell crisis. Instead of obtaining an order for a treatment that Defendants knew was effective (exchange transfusions), Defendants provided no disease-

---

[1] It is not clear when the "decision" to treat Mr. Torrence with hydroxyurea occurred or if Defendants' refusal to provide treatment was rationalized as a clinical decision post-hoc.

modifying treatment.  Defendants' deliberate indifference to Mr. Torrence's need for treatment caused needless damage to his body, excruciating pain, and risk to his life.  Defendants continued to advise against Mr. Torrence's exchange transfusions as late as May 28, 2020, when a nurse practitioner sought approval for Mr. Torrence's June 2020 exchange transfusion.  The Regional Medical Director finally put a stop to this on June 10, 2020, after informing Defendants that this was a "high profile" matter, that "[Mr. Torrence's] case is at the governor's office," and that "he had multiple ER runs and admission[s]."  In other words, the Defendants changed course only once Mr. Torrence filed this lawsuit.

Furthermore, in spite of Defendants' supposed "decision" to treat Mr. Torrence with hydroxyurea instead of exchange transfusions, there is no evidence showing that Mr. Torrence ever actually received hydroxyurea.  In fact, Mr. Torrence's medication administration records ("MARs") and witness testimony will also show that Defendants did not administer hydroxyurea to Mr. Torrence during that six-month period.  Hydroxyurea does not appear on his MARs at JCI until March 18, 2020, a few days before his regular exchange transfusions resumed.[2]  Accordingly, Defendants provided effectively zero treatment to Mr. Torrence during the six-month period August 26, 2019 to March 23, 2020. In essence, Defendants refused to provide Mr. Torrence's regularly scheduled monthly exchange transfusions allegedly in favor of the cheaper, ineffective hydroxyurea regimen, which they also did not provide to him until after four sickle cell emergency hospital visits during a six-month period.

Finally, medical records and witness testimony will show that Defendants never provided

---

[2] During her deposition, Defendant Hargraves (a medical administrator) was asked whether it was possible for a patient to be taking a drug regularly that is not on the MAR." Expressing doubt, she responded "That should never happen."  Furthermore, a hydroxyurea regimen requires intake monitoring and blood test monitoring every four weeks.  There is no evidence that Defendants performed any such activity in Mr. Torrence's medical record.

Mr. Torrence with adequate pain management.  As there is no cure for SCD, pain management treatment is an essential aspect of treating SCD patients.  Dr. Law prescribed a regimen of 30 mg of oxycodone every four hours as needed, which Dr. Lanzkron opined aligned "with the current NHLBI and ASH guidelines for acute pain management."  Defendants have never provided anything close to this amount, causing Mr. Torrence unnecessary levels of pain.

Once the medical staff at JCI reinstated Mr. Torrence's regularly scheduled monthly exchange transfusions in March 2020, Mr. Torrence had no emergency room visits or hospital admissions.  However, on October 27, 2022, Mr. Torrence was transferred to NBCI and once again denied monthly exchange transfusions.[3]  Between the date of his transfer and January 25, 2023, Mr. Torrence missed two months of exchange transfusions.  On December 27, 2022, Mr. Torrence was transferred back to JCI.  On January 25, 2023, he was rushed to the emergency room and admitted to UMMC for hypoxia, a life-threatening condition where tissues in the body do not receive enough oxygen.  Mr. Torrence's entire body was suffocating to death because he was denied access to exchange transfusions.  While Mr. Torrence was admitted, he received an exchange transfusion.

**Plaintiff's Legal Claim**

Plaintiff brings the following legal claim:

- **Denial of medical care under the Eighth and Fourteenth Amendments to the United States Constitution:** For failing to provide adequate medical care despite knowledge of a serious medical need.

   b. **A Brief Statement of Facts That Each Defendant Proposes to Prove or Rely Upon As a Defense Thereto, Together with a Listing of the Separate Legal Theories Relied Upon in Support of Each Affirmative Defense.**

Defendants' Statement of Facts

---

[3] Corizon Health, Inc., the Defendants' employer or former employer, also provides the medical staff for NBCI.

This case arises from a complaint filed by Plaintiff Dwayne Torrence, Jr., on May 13, 2020. Plaintiff alleges a cause of action against all defendants for Violation of Civil Rights under 42 U.S.C. §1983 and the 8th Amendment. He claims Defendants demonstrated deliberate indifference to his serious medical needs by refusing to provide exchange transfusion treatments, failing to manage his pain properly, and neglecting to care for his Medi-port.

Plaintiff's Medical History:

**2018-2019: Initial Treatments and Medi-Port Placement**

Plaintiff was under the care of Dr. Law, his hematologist, for sickle cell disease. While in custody at North Branch Correctional Institution (NCBI) and prior to his transfer to Jessup Correctional Institution (JCI), Dr. Law wrote a letter dated January 16, 2018, advising that Plaintiff take Oxycodone 30 mg every four hours as needed for pain. Oxycodone is a potent opioid analgesic prescribed for the management of moderate to severe pain. It works by binding to opioid receptors in the brain and spinal cord, altering the perception and response to pain. It has a high potential for additional and physical dependence, particularly with prolonged use. This risk is heightened in individuals with a history of substance abuse.

On January 7, 2019, Plaintiff received apheresis treatment at the University of Maryland Medical Center (UMMC), where it was noted that he had been receiving monthly red blood cell exchanges since March 27, 2017. A Medi-port placement was approved and performed on March 4, 2019. Plaintiff was transferred to JCI on March 8, 2019, and continued to receive treatment there, including apheresis. Apheresis treatment is a medical procedure that involves the removal of whole blood from a patient, separation of the blood into its components, and then the selective removal or treatment of one or those components before the remaining parts are returned to the patient's circulation. This process can target and remove specific blood cells, plasma, or other

constituents, depending on the medical need. In the context of sickle cell anemia, apheresis, specifically red cell exchange apheresis, also known as erythocytapheresis, is used to manage the disease.

**March 2019 - June 2019: Continued Care and Pain Management**

While at JCI, Plaintiff was seen for pain and sickle cell crisis on multiple occasions. On May 8, 2019, Plaintiff refused Motrin offered to him for pain. On May 10, 2019, Dr. Wright submitted a consultation request for UMMC hematology to continue Plaintiff's blood transfusions and renewed Plaintiff's Eliquis/Apixaban medication. On May 28 and May 31, Plaintiff went to UMMC for a blood draw and a blood transfusion, respectively. Throughout June 2019, Plaintiff received multiple Nubain injections for pain management.

**June 2019 - December 2019: Issues with Compliance and Alternative Treatments**

In June 2019, Plaintiff's non-adherence to his treatment regimen was noted again. Despite his complaints of pain, he refused some treatments and medications. A consultation request for hematology was approved for seven transfusion appointments, but Plaintiff refused follow-up visits and was non-compliant with his Eliquis medication. In October 2019, Plaintiff missed a blood transfusion appointment, which was then rescheduled. On November 4, 2019, Dr. Bartels recommended an alternative treatment plan (ATP), suggesting hydroxyurea instead of transfusions, citing Plaintiff's non-compliance with oral therapy. Despite this recommendation, several requests for Oxycodone and other medications were approved during this period. Plaintiff continued to receive medical care from August 2019 through March 2020 and beyond.

Plaintiff's assertions that there is no evidence he received hydroxyurea are false. Medical records demonstrate that Plaintiff was indeed prescribed and administered Hydrea, the brand name for

hydroxyurea. The records show that Plaintiff received Hydrea or Hydroxyurea 500mg on the following dates:

- 08/17/2017 - 09/17/2017

- 08/02/2017 - 11/20/2017

- 11/20/2017 - 01/12/2018

- 01/12/2018 - 02/07/2018

- 02/07/2018 - 04/17/2018

- 03/09/2020 - 03/14/2020

- 03/14/2020 - 05/09/2020

- 05/09/2020 - 09/02/2020

- 09/02/2020 - 01/02/2021

Furthermore, during a provider visit on 11/06/2023, Plaintiff stated that his symptoms are chronic but "fairly controlled on hydroxyurea."

Plaintiff also argues that Defendants provided zero treatment during the six-month period from August 26, 2019, to March 23, 2020. This is also false. Plaintiff's medical records from August 3, 2019, to March 2020 show that Defendants provided Plaintiff with consistent medical treatment:

- 08/03/2019: Skilled care injection visit with RN Carlin Lebreton; Plaintiff complained of chest and back pain. Nubain 10mg/1ml was administered in the right deltoid and tolerated well.

- 08/05/2019: Nurse sick call; Plaintiff presented for a Nubain IM shot for pain rated 7/10. Nubain was given in the left deltoid and tolerated well.

- 08/09/2019: Nurse sick call; Nubain 10mg/1ml was given in the right deltoid and tolerated well.

- 08/14/2019: Nubain 10mg/1ml was given in the left deltoid and tolerated well.

- 08/15/2019: Nubain 10mg/1ml was administered in the left deltoid as ordered.

- 08/17/2019: Provider chronic care visit with Motunrayo Adegorusi, NP; next chronic care clinic scheduled and labs ordered.

- 08/19/2019: Nurse sick call; Plaintiff presented at the dispensary for a Nubain IM shot for pain rated 7/10.

- 08/20/2019: Non-formulary drug request form completed by Bernard Alenda, NP.

- 08/21/2019: Non-formulary drug request form completed by Bernard Alenda, NP.

- 08/23/2019: Patient presented status post offsite lab draw prior to upcoming exchange transfusion.

These records clearly refute Plaintiff's claims and demonstrate that he received ongoing medical attention and treatment during the disputed period.

## 2020: Continued Treatments, Non-Compliance, and COVID-19 Complications

On January 7, 2020, an administrative note was entered for folic acid, and by January 24, 2020, monthly lab checks and exchange transfusions were recommended. Plaintiff continued to receive various treatments for his sickle cell disease, including Oxycodone and Nubain injections. In February 2020, a hematology consult was recommended to confirm the need for continued exchange transfusions. Throughout March and April 2020, Plaintiff received IV fluids and was taken to the hospital multiple times for sickle cell crises. On June 12, 2020, Plaintiff tested positive for COVID-19 and was placed in isolation for fourteen days.

## Legal Theories Relied Upon

Plaintiff claims that defendants deprived him of his rights by (1) failing to provide monthly exchange transfusions and (2) failing to properly care for his Medi-Port. To successfully maintain

a cause of action for a § 1983 claim based on improper medical care, Plaintiff must allege sufficient facts for the trier of fact to find that Defendants' acts, or failures to act, amounted to deliberate indifference to a serious medical need. This involves a two-component test: an objective, serious medical need component and a subjective, deliberate indifference component.

Defendants' Defense

**(1) Provision of Medical Care:**

Plaintiff's medical records indicate that he received substantial medical treatment for his sickle cell disease, including regular administration of Nubain shots and Oxycodone, despite his claims of inadequacy. Plaintiff's medical records also show that Plaintiff received hospital treatments in October and December 2019 for sickle cell pain/crisis, contradicting claims of deliberate indifference.

**(2) Compliance and Safety Concerns:**

Plaintiff's records also demonstrate significant non-compliance with prescribed treatments, including refusal of medications and follow-up visits, which complicates the administration of consistent medical care. NBCI's cautious policy regarding prescription medications, due to the risks of misuse and inmate safety concerns, supports the measured approach taken by the medical staff. The recommendation of hydroxyurea over transfusions is grounded in established medical guidelines and evidence-based practice. Major health organizations, including the National Institutes of Health (NIH) and the American Society of Hematology (ASH) endorse hydroxyurea as a first line treatment for SCD due to its proven benefits and manageable safety profile. Plaintiff claims that he informed certain Medical Defendants that Hydroxyurea treatments had historically been ineffective for him. However, Dr. Mandip Bartels, the Centralized Utilization Medical Director, reviewed inpatient and primary care notes generated by the hospital during Plaintiff's

previous medical treatments. These records indicate that the hospital had documented Plaintiff's past medical history and treatment efficacy. This medical history did not include a prior history of documented use of Hydroxyurea.. The decision to prescribe hydroxyurea, despite plaintiff's claim of its previous ineffectiveness, is still grounded in sound medical judgement and adherence to established standards of care. By ensuring proper administration, dosage adjustment, and comprehensive monitoring within the controlled environment of the prison, defendants aimed to optimize plaintiff's treatment outcomes and manage his condition effectively while minimizing the risks associate with alternative therapies. This approach reflects a commitment to providing appropriate and effective medical care rather than deliberate indifference.

**(3) Medical Judgment and Policy:**

The decisions regarding Plaintiff's treatment, including the use of hydroxyurea and the cautious prescription of narcotics, were based on sound medical judgment and policies aimed at ensuring the safety and well-being of all inmates. NCBI maintains a cautious policy regarding the prescription of certain pain medications due to significant safety concerns. These include the risk of inmates not taking their medications as prescribed to sell them, and the potential for those who are taking these medications to become targets of assault by other inmates. Prison environments present unique challenges that necessitate a cautious approach to prescribing medications like oxycodone. Inmates may misuse or divert oxycodone for recreational purposes or trade it for other goods or services. This can lead to a black market within the prison, creating safety and security issues. Given the addictive nature of oxycodone, there is a high risk of developing substance use disorders among inmates. Prisons often have limited resources for managing addiction which makes prevention crucial. To mitigate these risks, prison medical staff often employ alternative pain management strategies such as non-opioid analgesics like acetaminophen, Motrin and

naproxen, which has been prescribed to Plaintiff. Testimonies from Dr. Temesgen and other regional medical directors will highlight the necessity of such policies.

Plaintiff's disagreement with the pain management regime, while indicative of his dissatisfaction, does not meet the high threshold required to prove deliberate indifference. The medical records and testimony will demonstrate that Plaintiff's serious medical needs were addressed with due diligence and appropriate medical interventions, thereby negating the claim of deliberate indifference under § 1983.

c. **Similar Statements As to Any Counterclaim, Crossclaim, or Third-Party Claim.**

There have been no counterclaims, crossclaims, or third-party claims filed in this matter.

d. **Any Amendments Required of the Pleadings.**

Plaintiff has no amendments to the pleadings at this time. Plaintiff reserves the right to amend the pleadings to conform to the evidence presented at trial.

Defendants have no amendments to the pleadings at this time. Defendants reserve the right to amend the pleadings to conform to the evidence presented at trial.

e. **Any Issue in the Pleadings That Is to Be Abandoned.**

Plaintiff has not identified any issue in the pleadings that is to be abandoned.

f. **Stipulations of Fact or, If the Parties Are Unable to Agree, Requested Stipulations of Fact.**

Defendants do not agree to stipulate to any facts. Accordingly, the following are proffered by Plaintiff as requested Stipulations of Fact:

1. Dwayne Torrence has suffered from sickle cell disease of the most severe variety, hemoglobin SS disease, for his entire life.

2. Dr. Jennie Law is a specialist in hematology and sickle cell disease at the University of Maryland Medical Center.

3. Dr. Jennie Law is Dwayne Torrence's treating physician for his sickle cell disease outside of Jessup Correctional Institution.

4.      To manage the chronic pain associated with Dwayne Torrence's sickle cell disease, Dr. Jennie Law recommended 30 mg oxycodone every 4 hours as needed.

5.      On or about February 12, 2019, Dr. Jennie Law and/or her team at University of Maryland Medical Center recommended that Dwayne Torrence have a power injectable Mediport implanted in his chest.

6.      On or about March 4, 2019, Dr. Jennie Law and/or her team at University of Maryland Medical Center implanted a power injectable Mediport in Dwayne Torrence's chest.

7.      Dwayne Torrence received a regularly scheduled monthly exchange transfusion on or about August 26, 2019.

8.      Dwayne Torrence did not receive a regularly scheduled monthly exchange transfusion in September 2019.

9.      Dwayne Torrence did not receive a regularly scheduled monthly exchange transfusion in October 2019.

10.     Dwayne Torrence did not receive a regularly scheduled monthly exchange transfusion in December 2019.

11.     Dwayne Torrence did not receive a regularly scheduled monthly exchange transfusion in January 2020.

12.     Dwayne Torrence did not receive a regularly scheduled monthly exchange transfusion in February 2020.

13.     Dwayne Torrence was admitted to University of Maryland Medical Center from October 20, 2019 to October 26, 2019.

14.     Dwayne Torrence received an emergency exchange transfusion at University of Maryland Medical Center on or about October 25, 2019.

15.     Dr. Mandip Bartels was a utilization management medical director at Corizon during the relevant time period.

16.     Dr. Bartels described her role as reviewing the medical necessity of outpatient diagnostic testing or services.

17.     Dr. Bartels explained that her decisions are based on evaluations of the patients on site, the costs of the care, and the security risks involved in providing the care.

18.     On or about October 21, 2019, Dr. Mandip Bartels received a request from Motunrayo Adegorusi, NP, to approve Dwayne Torrence's next six continued, regularly scheduled outpatient exchange transfusions at University of Maryland Medical Center.

19. An inpatient note from October 20, 2019 and an outpatient note from April 2019 were provided to Dr. Bartels along with the request.

20. After reviewing these two documents, Dr. Bartels determined that there was no medical rationale behind, or support in the medical literature for, the plan to provide Dwayne Torrence with the next six exchange transfusions.

21. Dr. Bartels decided instead to restart Dwayne Torrence on a hydroxyurea regimen, and Dr. Bartels issued an alternative treatment plan to this effect.

22. Dr. Bartels never physically examined Dwayne Torrence in making her determination to change the treatment plan for his sickle cell disease.

23. Dr. Bartels never communicated with Dwayne Torrence in making her determination to change the treatment plan for his sickle cell disease.

24. Dr. Bartels decided not to consult Corizon's hematologist, Dr. Richard Kosierowski, in making her determination to change the treatment plan for Dwayne Torrence's sickle cell disease.

25. Dr. Bartels decided not to consult Dr. Jennie Law—Dwayne Torrence's treating physician and renowned sickle cell expert—in making her determination to change the treatment plan for Dwayne Torrence's sickle cell disease.

26. The site provider, Motunrayo Adegorusi, and the Regional Medical Director, Dr. Kasahun Temesgen, accepted Dr. Bartels' alternative treatment plan.

27. Dwayne Torrence was admitted to Johns Hopkins Hospital from December 13, 2019 to December 23, 2019.

28. Dwayne Torrence was admitted to the University of Maryland Baltimore Washington Medical Center on or about February 24, 2020.

29. Dwayne Torrence was admitted to the University of Maryland Baltimore Washington Medical Center from March 6, 2020 to March 9, 2020.

30. Dwayne Torrence did not receive a regularly scheduled monthly exchange transfusion in November 2022.

31. Dwayne Torrence did not receive a regularly scheduled monthly exchange transfusion in December 2022.

32. On or about January 25, 2023, Dwayne Torrence was admitted to the University of Maryland Medical Center for hypoxia, and he received an emergency exchange transfusion during this hospital stay.

33. No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in July 2019.

14

34.   No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in August 2019.

35.   No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in September 2019.

36.   No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in October 2019.

37.   No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in November 2019.

38.   No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in December 2019.

39.   No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in January 2020.

40.   No one employed by Jessup Correctional Institution and/or Corizon administered hydroxyurea to Dwayne Torrence in February 2020.

41.   Dwayne Torrence was not administered hydroxyurea from at least as early as July 2019 until on or about March 18, 2020.

42.   Corizon and Jessup Correctional Institution resumed providing Dwayne Torrence with regularly scheduled monthly exchange transfusions on or about March 23, 2020.

43.   Dwayne Torrence filed this lawsuit on or about May 13, 2020.

44.   Dr. Bartels received another request for additional regularly scheduled exchange transfusions for Dwayne Torrence on or about May 27, 2020.

45.   In response to this request, Dr. Bartels still attempted to take Dwayne Torrence off of his regularly scheduled monthly exchange transfusions.

46.   On June 10, 2020, the Regional Medical Director, Dr. Temesgen, responded to Dr. Bartels' latest recommendation against Dwayne Torrence's regularly scheduled exchange transfusions in Corizon's electronic referral system, writing "High profile, his case is at the governor's office, he had multiple ER runs and admission[s,] better to have scheduled exchange transfusion."

47.   With certain exceptions, Dwayne Torrence has generally received his regularly scheduled exchange transfusions after he filed this lawsuit.

48.   Nicole Hargraves was the Health Services Administrator at Jessup Correctional Institution during the relevant years.

49.     On November 22, 2019, Dwayne Torrence filed an Administrative Remedy Procedure ("ARP"), ARP Case. No. JCI 1291-19, in which he explained the importance of getting his regularly scheduled monthly exchange transfusions and implored the medical staff at Jessup Correctional Institution to provide them as ordered by Dr. Law.

50.     Nicole Hargraves was generally responsible for investigating ARPs related to medical care.

51.     Nicole Hargraves investigated Dwayne Torrence's not being sent out for transfusions.

52.     Nicole Hargraves did not contact Dr. Law as part of her investigation.

53.     There was an ARP Case Summary prepared for ARP Case No. JCI 1291-19. The Case Summary is dated December 23, 2019.

54.     Nicole Hargraves' signature is on the bottom of page 2 of the Case Summary.

55.     The Case Summary shows that no witnesses or employees were interviewed as part of the investigation.

56.     On December 3, 2019, Dr. Liberatus DeRosa wrote up an administrative note in the electronic system.

57.     In this administrative note, Dr. DeRosa stated that "Dr. Law called and wanted [patient] to be switched back to his exchange transfusion . . . .  This is due to [patient] having [Acute Chest Syndrome.]  Dr. Bartels advised that the [standard] of care is hydroxyurea which I am not sure is superior to 8 unit exchange transfusion."

g.  **The Details of the Damages Claimed or Any Other Relief Sought As of the Date of the Pretrial Conference.**

Section 1983 of Title 42 of the U.S. Code entitles U.S. citizens to equitable relief or redress when an individual acting under state law deprives such claimant "of any rights, privileges, or immunities secured by the Constitution and laws." The Eighth Amendment protects individuals from "cruel and unusual punishment." It "has been clearly established by the Supreme Court and [the Fourth] Circuit since at least 1976" that the Eighth Amendment gives prisoners the "right to adequate medical care and freedom from deliberate indifference to medical needs . . . ." *Scinto v.*

16

*Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016); *see also Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976).

In light of the facts that gave rise to this case, and the harms that continue to occur during its pendency, Defendants violated Mr. Torrence's Eighth Amendment rights by displaying a deliberate indifference to his medical need for regular exchange transfusions and sufficient pain treatment to treat his disease. As a result, Mr. Torrence is entitled to monetary damages from Defendants in their personal capacities. Furthermore, Mr. Torrence is entitled to prospective equitable relief regarding Defendants' conduct in their official capacities. Accordingly, Mr. Torrence seeks injunctive relief requiring Defendants to provide him with regularly scheduled, monthly exchange transfusions at University of Maryland Medical Center ("UMMC"), along with adequate pain management for his disease, and monetary damages for his suffering at the hands of the Defendants.

     **h.** **A listing of each document or other exhibit, including summaries of other evidence, other than those expected to be used solely for impeachment, separately identifying those which each party expects to offer and those which each party may offer if the need arises. The listing shall indicate which exhibits the parties agree may be offered in evidence without the usual authentication. This requirement may be met by attaching an exhibit list to the pretrial order.**

See attached exhibits list. Each of the parties reserves the right to offer any exhibit identified by the other parties in their exhibits lists. Each of the parties also reserves the right to utilize additional demonstrative evidence.

     **i.** **A List For Each Party Of The Name, Address, And Telephone Number Of Each Witness, Other Than Those Expected To Be Called Solely For Impeachment, Separately Identifying Those Whom The Party Expects To Present And Those Whom The Party May Call As The Need Arises.**

**Plaintiff's Witnesses**

**WILL CALL:**
- Dr. Jennie Law, MD
  655 W. Baltimore Street, Baltimore MD 21201

(410) 328-6373

- Dwayne Torrence
  Contact through Plaintiff's counsel

**MAY CALL:**
- Dr. Mandip Bartels, MD
  Contact through Defendants' counsel

- Dr. Vivien Dorsey, MD
   Contact through Defendants' counsel

- Dr. Sylvie Stacy, MD
  Contact through Defendants' counsel

- Nicole Hargraves
  Contact through Defendants' counsel

- Dr. Robert Williams, MD
  Contact through Defendants' counsel

- Bernard Alenda, NP
  Contact through Defendants' counsel

- Dr. Liberatus DeRosa, MD
  Contact through Defendants' counsel

- Dr. Mofikpara Wright, MD
  Contact through Defendants' counsel

- Electa Awanga, NP
  Contact through Defendants' counsel

- Dr. Kasahun Temesgen, MD
  Contact through Defendants' counsel

- Motunrayo Adegorusi, NP
  Contact through Defendants' counsel

- Dr. Mulugeta Akal, MD
  Contact through Defendants' counsel

- Ellen Dupont
  Contact through Defendants' counsel

**<u>Defendants' Witnesses</u>**

- Dwayne Torrence
  Contact through Plaintiff's counsel

- Dr. Mandip Bartels, MD
  Contact through Defendants' counsel

- Dr. Vivian Dorsey, MD
  Contact through Defendants' counsel

- Nicole Hargraves
  Contact through Defendants' counsel

- Dr. Robert Williams, MD
  Contact through Defendants' counsel

- Bernard Alenda, NP
  Contact through Defendants' counsel

- Dr. Liberatus DeRosa, MD
  Contact through Defendants' counsel

- Dr. Mofikpara Wright, MD
  Contact through Defendants' counsel

- Electa Awanga, NP
  Contact through Defendants' counsel

- Dr. Kasahun Temesgen, MD
  Contact through Defedants' counsel

- Motunrayo Adegorusi, NP
  Contact through Defendants' counsel

Defendants reserve to call as a witness in their own case any individual identified by Plaintiff.

**j.** **A list for each party of the name and specialties of experts the party proposes to call as witnesses including hybrid fact/expert witnesses such as treating physicians.**

**Plaintiff's Expert and Hybrid Witnesses:**
- Dr. Jennie Law, MD – Dr. Law is a medical doctor and is Plaintiff's treating physician. Dr. Law is also an expert in hematology and sickle cell disease.
- Dr. Sophie Lanzkron, MD – Dr. Lanzkron is a medical doctor and is an expert in hematology and sickle cell disease.

**Defendants' Expert and Hybrid Witnesses:**

- Defendant may call each of the physician and nurse defendants.  It is anticipated that each of these individuals' testimony will be "hybrid" in the sense that much of the knowledge they have of the facts of this case is outside the scope of that of a layperson.

**k.  A list of the pages and/or lines of any portion of a deposition to be offered in a party's case in chief or any counter-designations under Fed. R. Civ. P. 32(a)(4).**

**Plaintiff's Designations:**

Deposition of Dr. Mandip Bartels

Deposition of Nicole Hargraves

Deposition of Dr. Kasahun Temesgen

Plaintiff reserves the right to make additional designations should any witnesses become

unavailable for trial.

**Defendants' Designations:**

Deposition of Dr. Mandip Bartels

Defendants reserve the right to make additional designations should any witnesses become

unavailable for trial.

**l.  Any other pretrial relief, including a reference to pending motions, which is requested.**

Plaintiff does not request any pretrial relief at this time.

Respectfully submitted,                                   Dated: May 28, 2024

/s/ George M. Clarke, III                             /s/ Megan T. Mantzavinos
George M. Clarke, III                                 Megan T. Mantzavinos
Bar No. 480073                                        Bar No. 16416
Baker & McKenzie, LLP                                 Marks, O'Neill, O'Brien, Doherty & Kelly, P.C.
815 Connecticut Avenue                                mmantzavinos@moodklaw.com
Washington, D.C. 2006                                 600 Baltimore Avenue, #305
Phone: (202) 835-6148                                 Towson, Maryland 21204
Fax: (202) 416-7184                                   (410) 339-6880
george.clarke@bakermckenzie.com                       (410) 339-6881 (Fax)

*Attorney for Plaintiff, Dwayne R. Torrence, Jr.*     *Attorney for Defendants*